## MIDLAND VALLEY R. CO. v. CLARK.

No. 9807—Opinion Filed April 6, 1920.

(Syllabus by the Court.)

1. **Release—Personal Injuries—Fraud and Mistake—Proof.**
In the absence of fraud or mistake the executed agreement of settlement made by a railroad company with one injured while in

the employment of the company constitutes as conclusive and as effectual an estoppel against the party seeking to repudiate the settlement thus made as the final judgment of a court of competent jurisdiction to the effect that the rights of the parties are as they are set forth in the agreement. The burden is always upon the assailant of the contract to establish the vice which he alleges induced him, and a bare preponderance of evidence will not sustain the burden. A written agreement of settlement and release will not be rescinded for fraud or mistake unless the evidence of the fraud or mistake is clear and convincing.

**2. Appeal and Error—Review—Harmless Error.**

No judgment will be set aside or new trial granted by an appellate court of this state in any case upon the ground of misdirection of the jury unless, in the opinion of the court to which the application is made, after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right.

Error from District Court, Kay County; W. M. Bowles, Judge.

Action for personal injuries by Perry Clark against the Midland Valley Railroad Company. Judgment for plaintiff and defendant brings error. Affirmed.

O. E. Swan and Sam K. Sullivan, for plaintiff in error.

W. N. Maben and J. F. King, for defendant in error.

PITCHFORD, J. This action was commenced in the district court of Kay county on the 13th day of August, 1917, by the defendant in error, as plaintiff, against the plaintiff in error as defendant, resulting in judgment for the plaintiff in the sum of $1,250. The parties will be referred to as they appeared in the trial court.

Plaintiff claimed damages against the defendant for personal injuries alleged to have been suffered by plaintiff while employed by the defendant in assisting a crew in charge of a wrecker in placing upon the track a derailed oil tank; alleging that in the course of said work the trucks of the oil tank had been placed on the track, and the body of the oil tank was hoisted by a boom or crane of the wrecker and brought around over the trucks; that while the oil tank was thus suspended in the air, the foreman under whom plaintiff was working called upon plaintiff to get a center-pin, and then while getting the center-pin the engineer in charge of the engine caused the boom or crane to be hoisted, mashing plaintiff's left hand in the pulley and cutting off the little finger and the finger next to it at the middle joint, and injuring the other fingers. It was alleged that the rule and custom in force on all wrecking trains and with wrecking crews was that, before any movement of the engine was given, signal should be given of the intention of the engineer so to do; that in the instant case the engineer carelessly placed the engine in motion without notice or warning. After the injury plaintiff was taken to the hospital of defendant, and operated on by the company physician. It became necessary to take off the first and second fingers, which left him without any fingers on his left hand except his thumb.

Defendant answered by way of general denial and pleaded contributory negligence on the part of the plaintiff, settlement with the plaintiff for all damages occasioned or resulting from, or that in any manner might result from, the injury alleged in plaintiff's petition, and that the plaintiff executed and delivered to defendant a written release and discharge of the defendant from all damages and claims for damages occasioned by or resulting from, or that might in any manner result from, such alleged injury. Plaintiff replied and alleged that the release was executed by him, but that the claim agent of the defendant and the physician of the company represented to him that his health was all right, and that his injuries would heal in a few days, and that he would be able to go to work in a few days; that, relying upon the representations so made, he signed the release; and, further, that at the time said claim agent and physician made the representations the same were false and fraudulent, and were made for the purpose of inducing the plaintiff to settle the case, and were known to be false and fraudulent by said claim agent and physician, and that but for the false and fraudulent representations so made he would not have executed the release or settled the cause of action for the money received.

The jury returned a verdict for $1,250 in favor of plaintiff, upon which the court rendered judgment. Defendant appeals.

The errors relied upon and argued by defendant may be summarized under the following heads: (1) Evidence not sufficient to prove negligence on the part of defendant; (2) plaintiff settled with defendant and executed a release in writing acknowledging full satisfaction of all claims for damages against defendant; and (3), error of the court in refusing instructions requested by defendant, and the giving of instructions by the court excepted to by the defendant.

The defendant contends that the evidence fails to show that plaintiff's injuries were caused by the negligence of the defendant. The plaintiff testified that at the time he started to get the center-pins the engine was *not running, and the cable was not moving,* and that the cable started moving after he got where the pins were. He also testified that it was customary to give a warning before starting the cable, and that he was not given any warning in this instance; that while he was stooping down to get the center-pin he staggered and threw his hand on the side of the cable, and was caught in the cable as it was moving, and it took his hand in under it and mashed his finger off, broke another and took off a strip of flesh, and that the engine was started without any warning. It was evidently considered dangerous to operate the machinery at the time of the accident without giving notice; if there was no danger, why was the necessity or custom for giving the notice? When we consider where the center-pins were, and their proximity to the pulley, with the injury following to the plaintiff, we are able to appreciate why it was customary to give the signal before starting the engine.

In Interstate Compress Co. v. Arthur, 53 Okla. 212, 155 Pac. 861, it is said:

"The master is bound to exercise reasonable care and diligence to provide a reasonably safe place in which the employe or servant is to work, and also reasonably safe machinery, tools, and appliances with which to perform the work required of him."

The jury under proper instructions found that the injury was the result of the negligence of defendant. We are of the opinion the evidence fully sustains the verdict.

The injury to the plaintiff occurred on the 25th of November, 1915, immediately after which he was taken to the hospital of defendant at Bell Plains, Kansas, and in a few days thereafter was sent to defendant's hospital at Muskogee, Oklahoma. On the 5th day of December following, the claim agent had some conversation with the plaintiff, but no settlement was effected. On the 12th of December the claim agent again visited plaintiff, at which time the plaintiff says the following occurred:

"He says, what did I think about settling; how much I wanted. I told him I hadn't thought anything about it. He said that the fellows down at the office would give you three hundred dollars. I told him I would rather wait until I got well. He said no, now. He said Hoss said that you was getting along fine, would be well, and the people, the company, would see after you and take care of you; he says you will be able to

get to work in a week and get you a job, and while he was talking to me he was fixing the papers, and he fixed them and laid them on the desk, and told me to come around there and asked me could I sign my name. He says, 'I seen your name on the statement that Hoss took.' I told him yes, and he pitched them down and showed me where to put my name, and I wrote my name. He wrote out the three hundred dollars, and laid it down on the table and told me to pick it up, and I give it to Mrs. Sparrows and let her keep it for me until I got ready to take it."

Dr. Hoss, the company's physician, testified that about three weeks after the accident Clark's condition was satisfactory; that all four fingers were off when Clark came to the hospital at Muskogee; that his hand was infected when he first arrived at Muskogee; that during December and January his hand was doing fairly well, and in January it was practically well; that in February his hand again became infected; that he had previously reported to the claim agent that Clark was getting along as well as could be expected.

The claim agent testified that he made no representations to the plaintiff as to the nature or extent of his injuries; that he did not tell him he would be able to go to work in a week; that he did tell him that when he got able to go back to work, if he would come or telephone him, he would see if he could not get another place down around the shops where he could make a living; that he might have told him that the doctor said he was getting along all right; that he had talked with Dr. Hoss about the condition of his hand, and that Dr. Hoss had said it was as good as could be expected for that kind of an injury.

Plaintiff left the hospital about the 1st of January, and on January 16, 1917, the plaintiff, in company with a friend, went to the Muskogee National Bank and cashed the check given him by the claim agent. Sometime in February the hand became infected again, blood poison developed, and plaintiff went back to the hospital and was again treated by the company's physician, and after remaining there a few days he left and went to his brother-in-law's, near Hulbert, Oklahoma, and while there he was visited by a Mr. Rachael, who informed him that if he did not feel like he had been treated right he *could get him a lawyer to help him out.*

Under the evidence in the case we would have no hesitation in affirming the judgment of the trial court, if nothing further appeared than the mere act of settlement with the claim agent. The plaintiff, a full-blood Cherokee Indian, with his hand smashed,

four fingers cut off, and at the time in the hospital of defendant, being approached by an expert claim agent and informed that the doctor had said the hand was doing fine, and that plaintiff would be able to return to work in a few days, and, further, that the defendant would take care of plaintiff and give him a job, with no friend around with whom he could advise, and at that time, no doubt, suffering from the shock and more or less affected by opiates administered by the physician at the time of the several operations, it is natural to suppose that under these circumstances he could be induced to make almost any kind of settlement suggested by the claim agent, especially when promised that the defendant would see that he would be taken care of in the future.

Courts should never hesitate to set aside releases in personal injury cases where the same have been induced by fraud and misrepresentation as to material matters, or for other reasons sufficient in law. Here, however, we are confronted with the fact that the plaintiff, after receiving the check in settlement of his claim against the defendant company on the 12th day of December, left the hospital and intermingled with his friends. He then knew the condition he was in; that is, he knew that his four fingers had been amputated, he knew that the statement was not true to the effect that he would be able to return to work in a few days, and on the 16th day of January thereafter, in company with a friend, he went to the bank and had the check cashed, after which he went to the home of his brother-in-law, where he remained until several months thereafter, when he was approached by someone who informed him that if he did not consider he had been treated right by the railroad this party could furnish him a lawyer who would be able to make the defendant pay a greater sum than the amount for which the settlement had been made. Evidently the plaintiff was made to believe that the difference would amount to several thousand dollars, for when the action was filed we find the claim was made for $20,000.

It is the contention of the defendant that when the plaintiff cashed the check he ratified the settlement. This would ordinarily be true, but we see that at the time the check was cashed the plaintiff's hand, according to Dr. Hoss, was in a satisfactory condition; in fact, the doctor seemed to think it was practically well. If the physician could not anticipate blood poison arising, how could knowledge that blood poison might set in be chargeable to the plaintiff? From the time of the injury to the trial, the plain-

tiff had been suffering from the effects of the injury. Swelling would develop, evidently indicating some infection. The law, as well as public policy, looks with favor upon settlements and upon compromises entered into fairly and in good faith; and when persons having disputes get together upon terms which are satisfactory and no fraudulent practices are indulged in. and the agreement reduced to writing, if either party thereafter undertakes to set the same aside, the evidence offered for that purpose should be clear and convincing, and, as was said in Moore v. Adams, 26 Okla. 48, "by a preponderance so great as to overcome all opposing evidence and repel the opposing presumptions."

In Lusk v. White, 58 Okla. 773, 161 Pac. 541, the second paragraph of the syllabus is as follows:

"It is a well-settled rule that fraud is never presumed, and that where a written contract is attacked on that ground the contract will be upheld unless the allegations of fraud are established by clear and convincing evidence, and the fraud must be predicated upon existing facts and cannot consist of mere promises as to future action."

To the same effect, see St. L. & S. F. R. Co. v. Chester, 41 Okla. 369, 138 Pac. 150; St. L. & S. F. R. Co. v. Bruner, 52 Okla. 349, 152 Pac. 1103; Martin et al. v. Bruner et al., 64 Oklahoma, 166 Pac. 400.

In the instant case it is evident plaintiff was not treating with the claim agent at arm's length. This conclusion is reached not only from considering all the surroundings at the time the release was signed, but from the additional fact that the plaintiff was a full-blood Indian, ignorant to the extent that he had to have someone read the contract of release to him. While we do not wish to be understood as holding that a full-blood Indian cannot make a binding contract, yet in dealing with this class of people we should consider that they are more easily imposed upon than one reared in the ways of the white man. It is a matter of common knowledge that the average full-blood Indian is lacking in perspective relative to his financial concerns. He has very little conception of the value of the dollar. The federal government has recognized this fact, and has spent much time and gone to great expense in devising ways and means to protect the full-blood Indian from those who would seek to take advantage of him. If there ever was a case in all the history of settlements for personal injuries made with claim agents of a railroad company, or any other company, where the courts were justified in setting aside the settlement and holding that the

same was absolutely null and void, we believe this case in that respect stands out in bolder and more prominent relief than any that has ever been reported in any court. This was one time when an unfortunate victim of the negligence of the railroad company, approached by the claim agent, assuredly needed someone to whisper in his ear, "Are not the arrows beyond thee?"

The defendant complains of the refusal of the court to give certain instructions, and especially instructions relating to setting aside the release, in which the court was requested to instruct the jury that the burden was on the plaintiff to prove by clear and convincing evidence the allegations of fraud, and that unless he did so the verdict must be for the defendant. The instruction given by the court on this point only required the jury to find from the preponderance of the evidence that said release was obtained by false representations, etc. In this we think the court was in error. The defendant was entitled to have the instruction requested—that fraud is never presumed, and that the burden was on the plaintiff to prove by clear and convincing evidence the allegations of fraud. While the court committed error in this respect, we would be loath to reverse the judgment for this reason alone.

Section 6005, Revised Laws 1910, provides that:

"No judgment shall be set aside or new trial granted by any appellate court of this state in any case, civil or criminal, on the ground of misdirection of the jury or the improper admission or rejection of evidence, or as to error in any matter of pleading or procedure, unless, in the opinion of the court to which the application is made, after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right."

As we construe this section, we believe that we would violate not only the letter but the spirit of same should we reverse the case because of the error of the court in refusing to give the instruction requested. We have examined the entire record, and are thoroughly convinced that the plaintiff was entitled to a greater compensation than $300, as under the evidence and under proper instructions the jury found that the defendant's negligence was the proximate cause of the injury to the plaintiff.

Without desiring to criticise the actions of the claim agent, we must say that his conduct does not appeal to our sense of what was due the plaintiff at the time of the settlement. As we have seen, the plaintiff was a full-blood Cherokee Indian and in a terribly maimed condition at the time, rendered a cripple for life, and assured that the doctor who was treating him had said that his hand was getting along all right and that he would be able to go to work in a few days; and, in addition to that, being promised that the railroad would take care of him in the future, and getting a settlement out of him under these conditions for the pitiful sum of $300, as we say, we believe we would be doing violence to the letter and spirit of the statute above quoted were we to reverse the judgment of the lower court for the errors assigned and argued by counsel.

The judgment of the trial court is affirmed

OWENS, C. J., and RAINEY, KANE, and JOHNSON, JJ., concur.